UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
UNITED STATES OF AMERICA                  :
                                          :
            - v. -                        :
                                          :        **16 Cr. 395 (VEC)**
CHRISTOPHER CAMPOS,                       :
                                          :
                        Defendant.        :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S OPPOSITION TO DEFENDANT CHRISTOPHER CAMPOS'
MOTIONS FOR ACQUITTAL AND A NEW TRIAL PURSUANT TO RULES 29 AND 33**


                              JOON H. KIM
                              Acting United States Attorney for the
                              Southern District of New York
                              One St. Andrew's Plaza
                              New York, NY 10007


Dina McLeod
Sagar K. Ravi
Niketh Velamoor
Assistant United States Attorneys
    *Of Counsel*

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motions of defendant Christopher Campos pursuant to Federal Rules of Criminal Procedure 29 and 33 for a judgment of acquittal and for a new trial (ECF No. 125 ("Def. Mem.")).

First, under Rule 29, the defendant argues that the evidence admitted at trial was insufficient to establish his intent to defraud and that he did not act in "good faith." (Def. Mem. at 1-6.) In addition, the defendant argues that there were multiple conspiracies at issue in the case and that there was a prejudicial variance between the Indictment and the Government's proof at trial. (*Id*. at 6-8.) Finally, the defendant contends that the misrepresentations on the fraudulent car loan applications were not material, and that the Government did not prove venue on the wire fraud count. (*Id*. at 8-12.)

Second, under Rule 33, the defendant generally asks the Court to set aside the jury verdict because of "extraordinary circumstances" resulting from the Court's rulings to exclude evidence offered by him. (*Id*. at 12-15.) All of the defendant's arguments are without merit, and his motions should be denied in their entirety. The evidence admitted at trial, particularly when viewed in the light most favorable to the Government, was more than sufficient for the jury to find the defendant guilty beyond a reasonable doubt of conspiracy to commit bank and wire fraud, bank fraud, and wire fraud, in violation of 18 U.S.C. §§ 1349, 1344, and 1343, respectively. Accordingly, the jury's verdict should not be set aside, and the Court should not order a new trial.

## BACKGROUND

### I.     The Indictment

On June 7, 2016, a Grand Jury sitting in the Southern District of New York returned an Indictment, 16 Cr. 395 (the "Indictment"), against the defendant, charging him with conspiracy

to commit bank and wire fraud, bank fraud, and wire fraud, in violation of 18 U.S.C. §§ 1349, 1344, and 1343, respectively.   Each of the charges alleged that the defendant and others he conspired with submitted fraudulent applications for loans to financial institutions in connection with automobile purchases by individuals they knew to be straw buyers of the automobiles.

## II.   Summary of Proof at Trial

Trial commenced on June 12, 2017, and the jury returned a guilty verdict on June 22, 2017.   The evidence at trial, summarized below, overwhelmingly established each of the elements of the charged crimes.

The defendant joined a conspiracy to use straw buyers to fraudulently purchase multiple personal use cars through loans issued to the straw buyers by various banks, when in fact other individuals intended to use the cars as livery cabs and pay off the loans.   The defendant's role was to recruit individuals with good credit scores to be straw buyers, and he recruited, at a minimum, Janina Pedroza, Susan Austin, his brother Ralph Perez, and his wife Krinsy Campos as straw buyers.   (Trial Transcript ("Tr.") 360, 554, 1088-1090.)   Ultimately, through the efforts of the defendant and his coconspirators, the straw buyers the defendant recruited fraudulently purchased approximately 40 new cars.   (*See* GX 1101.)   These cars were purchased using car loans obtained by making misrepresentations to banks regarding, among other things, the true buyers and users of the cars, the intended use of the cars, the individuals actually responsible for paying the loans, and the total number of cars being purchased by each straw buyer.   (Tr. 222-26, 227-29.)

At trial, Norberto Taveras testified that he devised a scheme with Julio Alvarez to build a livery cab service using new cars purchased by straw buyers with a good credit score.   (Tr. 157-

2

71.)   The defendant, then an acquaintance of Julio Alvarez, joined this conspiracy by recruiting people with good credit scores and with the hopes of profiting from the fraud.   (Tr. 171-74.) Specifically, the defendant testified that he was supposed to receive five percent of the profits each car would generate after the car loan was paid off, and he explained that his wife and other family members received a vehicle for their personal use in exchange for putting up their credit scores as straw buyers.   (Tr. 934-35, 1084, 1088-89).   Susan Austin and Janina Pedroza both testified that the defendant recruited them to participate in this scheme.   (Tr. 53, 554.)   They also communicated with the defendant on all matters relating to the purchase and payments of the cars in their names.   (Tr. 74, 554.)   Both Pedroza and Austin further testified that, although they bought the cars in their names, they did not intend to use the cars for personal use or pay back the loans, contrary to the representations they made on their loan applications.   (Tr. 72-75, 677-78.)

        The defendant himself submitted a false address for his wife's car loan application to Norberto Taveras.   (Tr. 189-190.)   Specifically, the defendant instructed Taveras to change his wife's address on the car loan documents to an address at 176 Nagle Avenue in New York even though he and his wife were both living in New Jersey at the time.   (Tr. 189-90, 230, 1117; GX 804.)   The defendant provided this false address so that the cars his wife bought could be registered in New York as livery cabs and get out on the road faster.   (Tr. 189.)   And the defendant himself admitted that he knew that false address would be provided to banks.   (Tr. 1125.)   The defendant also provided the same false address to Liberty Mutual in order to get his wife's cars insured as personal use vehicles in New York even though he knew they were to be used as livery cabs.   (*See* GX 1301, GX 1302.)

Once Alvarez began to fall behind on making payments on the loans, the banks began contacting the straw buyers whose names were on the car loan documents.    For example, Susan Austin, who purchased over twenty new cars to be used as livery cabs, testified that banks relentlessly contacted her for payments the defendant had assured her she would never have to make.    (Tr. 497-501.)    When Gateway Bank called Austin and told her that the straw purchases were illegal, Austin contacted the defendant, who instructed her not to talk to the banks any more and that he would handle it.    (Tr. 500-06, 653.)    The defendant then sent multiple letters to banks that issued car loans to Austin, falsely informing them, among other things, that Austin would "make sure all payments are on time" and "maintain[] possession of [the] vehicle," even though he knew that she was not responsible for any payments on the cars and did not know where the vehicles were.    (Tr. 515-21; GX 106, GX 108, GX 109.)    In a number of recorded conversations with Austin that were admitted into evidence, the defendant also explained to Austin, in substance and in part, that they needed to pay off the car loans in order to make the banks go away and avoid prosecution for the scheme.    (*See* GX 125 – GX 130.)

Employees of two banks that received fraudulent loan applications from straw buyers recruited by the defendant testified regarding, *inter alia*, the materiality of representations made in the car loan applications as to the buyer of the vehicle and the use of the vehicle.    (Tr. 684-98, 754-59.)    One of those bank employees, Christopher Sellarole of Gateway One Lending and Finance, personally interacted with the defendant and received a letter containing false statements from the defendant regarding one of Austin's vehicles.    (GX 106.)    Finally, a salesperson at a Mercedes-Benz dealership testified that the defendant purchased a $41,000

Mercedes-Benz vehicle by obtaining a car loan shortly before the defendant recruited straw buyers for the scheme, demonstrating that the defendant was familiar with the representations made in the fraudulent loan applications submitted to banks by straw buyers he recruited.[1]

## III.   Rule 29 Motion

At the close of the Government's case on June 19, 2017, defense counsel moved for a judgment of acquittal pursuant to Rule 29 and renewed the motion at the end of the defense case. (Tr. 854, 1239.)   The Court then held oral argument on the defendant's Rule 29 motion and denied the motion.   (Tr. 854-61, 1239.)   After instructing the jury on the applicable law and closing arguments, the Court submitted the case to the jury.   The jury returned a guilty verdict shortly thereafter.   (Tr. 1378-79.)   On July 14, 2017, the defendant filed the instant motion.

## DISCUSSION

## I.   The Rule 29 Motion Must be Denied

### A.   Applicable Law

A defendant challenging the sufficiency of the evidence "bears a heavy burden."   *United States* v. *Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States* v. *Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008)).   A conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *United States* v. *Persico*, 645 F.3d 85, 105 (2d Cir. 2011).   The Court cannot disturb a jury's verdict unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable

---

[1]  The evidence at trial also consisted of numerous exhibits, including, among other things, the fraudulent loan applications submitted to banks and the defendant's own statements in furtherance of the conspiracy, as reflected in text messages, recordings, emails, and letters.

5

jury could find guilt beyond a reasonable doubt." *United States* v. *Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (internal quotation marks omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed "in the light most favorable to the Government." *United States* v. *George*, 779 F.3d 113, 115 (2d Cir. 2015). The Court must analyze the pieces of evidence "in conjunction, not in isolation," *Persico*, 645 F.3d at 104 (quoting *United States* v. *Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the Government's case and not to each element, as each fact may gain color from others," *Cuti*, 720 F.3d at 462 (quoting *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)).

The Court must also "credit[] every inference that the jury might have drawn in favor of the Government," because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing Court." *Cuti*, 720 F.3d at 461-62 (internal quotation marks and citations omitted). Even where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks omitted). *See also, e.g., United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) ("[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." (citing *Guadagna*, 183 F.3d at 129 ("Rule 29(c) does not provide the trial Court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."))); *United States* v. *Matthews*, 20 F.3d 538, 548 (2d Cir. 1994) (stating that Court must affirm conviction "so long as, from the inferences reasonably drawn

from the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt").

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable." *United States* v. *Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also United States* v. *Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it"). Accordingly, "the Government need not 'exclude every reasonable hypothesis other than that of guilt.'" *Guadagna*, 183 F.3d at 130 (quoting *Holland* v. *United States*, 348 U.S. 121, 139 (1954)); *see United States* v. *Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995) ("[I]t is the task of the jury, not the Court, to choose among competing inferences").

## B.   The Defendant Had the Requisite Intent to Defraud

The defendant seeks a judgment of acquittal on the basis that "[t]here was insufficient evidence to prove intent to defraud" and that there was "almost no evidence that Mr. Campos did not act in 'good faith.'" (Def. Mem. at 1.) This argument is entirely without merit. As is clear from the summary of the evidence set forth above, the evidence was more than sufficient for the jury to conclude that the defendant was guilty of the crimes charged in the Indictment and that he intended to defraud the banks who extended loans for the cars. (*See* Tr. 1358 ("'Intent to defraud' means to act knowingly and with the specific purpose of causing some financial harm or property loss to another. You may infer an intent to harm if the defendant's acts exposed the financial institution to potential loss, including by making false representations that would be

7

material to the financial institution's ability to accurately assess its credit risk even if the defendant intended for loans to be repaid.").)

The defendant's intent to defraud and clear lack of "good faith" stems from the number of straw buyers he recruited, the over forty cars those straw buyers bought, and the pattern of dishonesty reflected in the paper trail the defendant left behind in perpetuating and concealing this scheme.   An individual acting in "good faith" would not have lied to creditors about who possessed the cars, and would not have supplied a false address for his wife's car loan application.

The overwhelming evidence at trial established that the defendant knowingly recruited individuals for the purpose of submitting fraudulent car loan applications.   The defendant knew that these recruits – Susan Austin, Janina Pedroza, his wife, and his brother – would use their identities to submit car loan applications for personal use vehicles they would never possess, never use, and never pay for, and that were supposed to be used for commercial purposes as livery cabs and paid for by others.   Moreover, the defendant knew that each of these straw buyers were purchasing hundreds of thousands of dollars worth of cars in their own names – far more than they ever could have afforded.   The defendant also furthered this scheme by lying to creditors.   For example, he submitted letters on his law firm's letterhead stating that the straw buyers would remain in possession of the cars, knowing full well that all of the individuals he had recruited did not know the location of any of the cars they purchased to be used as livery cabs.   (GX 106, GX 108, GX 109.)   The defendant also lied directly to banks when he submitted a false address in New York to be used on his wife's car loan application, further demonstrating that he was not acting in good faith.

The defendant claims that it is "undisputed that Mr. Campos would have himself invested in the business but for his poor credit history."   (Def. Mem. at 2.)   This is patently incorrect. The evidence at trial established that the defendant obtained a car loan to purchase a Mercedes-Benz that was more expensive than any of the cars purchased by the straw buyers he recruited. (Tr. 710-11; *see* GX 1001, GX 1101.)   His "poor credit" did not prevent him from purchasing a luxury vehicle in or around the same time that he recruited his wife to be a straw buyer, and could not have prevented him from buying a car for this scheme.   In reality, the defendant decided not to purchase cars in his name in order to try to distance himself from the fraud scheme.   In any event, even if it were true that the defendant would have bought cars as a straw buyer if he had better credit, that does not negate his intent to defraud.

The defendant also asserts that his efforts to return certain cars purchased by straw buyers was further evidence of his good faith.   (Def. Mem. at 2.)   In recordings provided by Susan Austin, the defendant stated that the cars should be paid off in order to avoid prosecution.   The defendant specifically stated on the recordings that "if the cars get paid off then there's like a victimless crime, and I think, you know, everybody goes away."   (GX 128-T at 3.) Considering this evidence in light most favorable to the Government, the return of cars was not an act of "good faith" − it was part of a cover-up to avoid prosecution.   By limiting the loss to creditors, the defendant himself stated that his intention was to get the Government not to prosecute the fraud he perpetrated.   Accordingly, this evidence of the defendant's own conduct was more than sufficient to support the jury's verdict.

9

## C.   There Was No Improper Variance from the Indictment

The defendant argues that the Government's evidence established that there were multiple conspiracies all connected through Julio Alvarez, which was a variance from the Indictment which charged a single conspiracy and therefore caused substantial prejudice to the defendant.   (Def. Mem. at 6-8.)   This argument is baseless.

As the Second Circuit has stated, "[b]ecause proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment, this court has consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial."   *United States* v. *Pierce*, 785 F.3d 832, 845 (2d Cir. 2015). In order to "secure the reversal of a conviction on a multiple conspiracies theory, [the defendant] must show both that (1) 'the indictment charged a single conspiracy, but the proof disclosed several independent conspiracies, and (2) [the] defendant was so prejudiced by this variance as to be denied a fair trial.'"   *United States* v. *Needham*, 377 F. App'x 84, 86-87 (2d Cir. 2010) (quoting *United States* v. *Desimone*, 119 F.3d 217, 226 (2d Cir. 1997)).

As an initial matter, the defendant never requested a multiple conspiracies charge at trial. Such a request would have been inappropriate because the evidence at trial, viewed in the light most favorable to the Government, amply established that there was a single conspiracy centered around Julio Alvarez with a common goal – to use straw buyers to fraudulently obtain loans from banks and purchase cars to be used as livery cabs.   *See United States* v. *Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) ("In order to prove a single conspiracy, rather than multiple conspiracies, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." (internal quotation marks omitted)); *id*. at 48

10

("'[C]hanges in membership do not necessarily convert a single conspiracy into multiple conspiracies, . . . especially where the activity of a single person was 'central to the involvement of all.'" (internal quotation marks omitted)).   The fact that the defendant was not aware of every single member of the conspiracy does not transform the single conspiracy into multiple conspiracies.   It is settled law that "in order for a single conspiracy to be found, it is not necessary that the conspirators even know the identities of all the other conspirators," *id.* at 47, and a defendant "need not participate in, or even agree to, every act undertaken on behalf of the alleged conspiracy in order to be culpable as a member," *Needham*, 377 F. App'x at 87; *see also* Tr. 1368 ("[Defendant] need know only one other member of the conspiracy and need know only one of its unlawful goals.").   Here, the Government provided more than sufficient evidence at trial for the jury to conclude that the defendant was a member of the conspiracy charged in the Indictment, and that in connection with that conspiracy, he recruited straw buyers and caused others to submit fraudulent loan applications to banks in order for the straw buyers to purchase multiple cars to be used as livery cabs.

The only case the defendant cites in support of his position is *United States* v. *Sieger*, No. SS84 Cr. 158-CSH, 1985 U.S. Dist. LEXIS 20569 (S.D.N.Y. Apr. 19, 1985), but that case is inapposite.   The defendant analogizes to *Sieger's* wheel conspiracy theory and argues that he was one of the spokes in a wheel not connected by the outer rim to the other spokes of the conspiracy.   (*See* Def. Mem. at 6-8; *Sieger*, 1985 U.S. Dist. LEXIS 20569, at *24-25.)   But the facts of this case show otherwise.   The defendant joined the conspiracy when Julio Alvarez showed him dozens of cars at Alvarez's business, all of which were purchased through this scheme.   (Tr. 887-98.)   The defendant therefore knew that he was joining this scheme after it

11

had already started operating.   In *United States* v. *Manarite*, the Second Circuit ruled that "whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy." 448 F.2d 583, 589 (2d Cir. 1971).   The evidence at trial established that the defendant knew of the existence of other members of the conspiracy, including other straw buyers that were not recruited by him such as Gueris Ramos and Milagros Medina.   (Tr. 887-98.)   He therefore knew or certainly had reason to know of other straw purchases by other coconspirators connected through Julio Alvarez and Norberto Taveras.

Notably, even though the court in *Sieger* found there were multiple conspiracies, it did not find any prejudice warranting a judgment of acquittal.   *Sieger*, 1985 U.S. Dist. LEXIS 20569, at *35-38.   Here too, even assuming *arguendo* that the defendant is correct that there were multiple conspiracies proven at trial, the defendant has failed to establish any prejudice and this motion should be denied.

**D.      The Misrepresentations Made to the Lending Banks Were Material**

The defendant claims that the misrepresentations on the car loan applications were not material.   (Def. Mem. at 8-9.)   He attempts to substantiate this claim by citing the trial transcript of the two bank employees the Government called as witnesses:   Christopher Sellarole from Gateway One Lending and Finance and Kenneth Moncayo from JP Morgan Chase.

For example, the defendant cites Moncayo's testimony that as long as payments were made, the bank would not repossess the car if they learned that it was being used for commercial

purposes.   (Tr. 700-01.)   On the basis of this testimony, the defendant argues that it was not a material misrepresentation to list the car as a personal vehicle on the car loan application when the purchaser knew that it would be used as a livery cab.   The defendant's claim has no merit.

The purpose of a car loan application is for banks to assess whether they will extend credit to the buyer.   The material misrepresentations in the car loan applications at issue in this case were made at the time the application was submitted.   As both Sellarole and Moncayo testified, their banks only finance vehicles used for personal use and they do not finance cars used for commercial purposes due to the higher risks involved and the wear and tear on the vehicles.   (Tr. 690, 695, 755.)   In other words, had the banks known that the cars purchased in the scheme were going to be used as livery cabs, they would not have extended credit for the loans.   (Tr. 685-88, 700-01, 753-60.)   On the basis of this evidence alone, the jury could properly conclude that misrepresentations regarding the use of the vehicle were material to the banks.   (Tr. 1357-58 ("A fact is material if the fact is one that a reasonable person would expect to be of concern to a reasonable and prudent person making a decision based on the representation.").)   The fact that the banks decided not to repossess the car after it learned about the material misrepresentation because payments were being made does not negate the materiality of those misrepresentations at the time the banks were deciding whether to extend credit to the straw buyer.   Rather, as both Sellarole and Moncayo testified, decisions about whether or not to respossess vehicles are based on entirely different considerations, including the bank's desire to minimize its losses after the fact.   (Tr. 830-31.)

Both Moncayo and Sellarole also testified regarding the materiality of several other misrepresentations in the fraudulent loan applications submitted by the defendant and the straw

buyers he recruited, namely the name of the person responsible for paying the loan whose credit is evaluated by the bank, the address of the location of the car so that the bank can locate it, and the number of cars being purchased at the same time.   (Tr. 684-98, 754-59.)   Accordingly, even if the "personal use" representation had not been material, which it was, there were numerous other material misrepresentations made to banks that could have formed the basis for the jury's verdict.

### E.      The Government Proved Venue on the Wire Fraud Count

Finally, the defendant argues that there was insufficient evidence at trial to establish venue for the wire fraud count in the Southern District of New York.   (Def. Mem. at 11-12.) "[V]enue lies where a wire in furtherance of a scheme begins its course, continues or ends." *United States* v. *Rutigliano*, 790 F.3d 389, 397 (2d Cir. 2015).   "It is not necessary for the defendant to participate personally in the wire transmission, as long as it is reasonably foreseeable that the charged transmission would occur in the execution of the scheme." *United States* v. *Bahel*, 662 F.3d 610, 641-42 (2d Cir. 2011); (Tr. 1363); *see also United States* v. *Kim*, 246 F.3d 186, 192-93 (2d Cir. 2001) (finding venue proper where out-of-district defendant caused wire transmissions into and out of Southern District of New York); *United States* v. *Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982) (finding that faxes and telephone calls between Hong Kong and Manhattan established venue in Southern District of New York where defendant was not physically located in the district); *United States* v. *Martin*, 411 F. Supp. 2d 370, 376 (S.D.N.Y. 2006) (finding venue for substantive wire fraud based on coconspirator's conduct in the district).

The evidence at trial established, at a minimum, wire communications in furtherance of the wire fraud to and from Julio Alvarez that directly involved the defendant, and there can be no dispute that Alvarez and his business were located in Manhattan in the Southern District of New York.   (Tr. 159, 334, 578, 933.)   For example, the defendant himself testified that he faxed the credit application for Janina Pedroza to Alvarez's business.   (Tr. 928.)   The defendant also testified regarding calls between himself and Alvarez in connection with the scheme.   (Tr. 894, 896, 957, 1109.)   Furthermore, Pedroza testified that she called Alvarez multiple times when banks began calling her regarding late loan payments (Tr. 76-78), and Susan Austin testified regarding text messages she exchanged with Alvarez (Tr. 528-29; GX 118).   Finally, there was also evidence of at least one email sent to both the defendant and Alvarez regarding getting the payoff amounts for the loans.   (Tr. 557; GX 110.)   Given that the evidence at trial established that Alvarez and his business were located in Manhattan, there was a preponderance of evidence at trial that wire communications in the Southern District of New York were used in furtherance of the wire fraud.

For the reasons set forth above, the Court should deny the defendant's Rule 29 motion in its entirety.

## III.   The Rule 33 Motion Should be Denied

### A.      Applicable Law

Rule 33 permits a Court to "vacate any judgment and grant a new trial if the interest of justice so requires."   Fed. R. Crim. P. 33(a).   To grant a Rule 33 motion, a trial judge "must harbor a real concern that an innocent person may have been convicted."   *United States* v. *Lin Guang,* 511 F.3d 110, 119 (2d Cir. 2007) (citations omitted).   "Motions for a new trial are

disfavored in this [Second] Circuit," *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995),

and Rule 33 motions should be granted only "sparingly and in only the most extraordinary

circumstances."   *United States* v. *Ferguson*, 245 F.3d 129, 134 (2d Cir. 2001).

### B.     No Extraordinary Circumstances Are Present

The defendant provides two justifications for a Rule 33 motion.   (Def. Mem. at 12-13.)

First, the defendant argues that the Court wrongly denied his motion to admit all of the recorded

conversations made by Susan Austin or, in the alternative, certain excerpts identified by the

defendant (ECF Nos. 92, 103).   (Def. Mem. at 12-13.)   The Court heard the defendant's

arguments and properly decided not to admit the recordings sought by the defendant because the

recordings spanned eight hours over thirty conversations and did not satisfy the requirements of

Rule 106.   For the same reasons set forth in the Government's opposition to the defendant's

Rule 106 motion (ECF No. 107) and the Court's Order denying the motion (ECF No. 111), the

motion was correctly decided and the exclusion of those recordings do not warrant the

extraordinary relief of a new trial.

Second, the defendant asserts that the Court improperly excluded evidence from trial due

to the "Court's too parsimonious definition of relevance."   (Def. Mem. at 12-13.)   The Court

justifiably excluded the defendant's proffered evidence from Bernie Martins, Christopher

Meatto, and Jeff Bratisax because it was either not relevant, hearsay, was attempting to prove a

negative, or did not satisfy Rule 403.   (Tr. 1043-67, 1162-65.)   For example, the defendant

failed to show how testimony from Bernie Martins, who would have testified that the defendant

"wanted to minimize [Susan Austin's] financial liabilities and help her stave off bankruptcy"

(Def. Mem. at 13), would have consisted of anything other than inadmissible hearsay statements

16

from the defendant.   Similarly, the defendant failed to demonstrate how Christopher Meatto's

belief that Alvarez's business "had real potential" (Def. Mem. at 15) was relevant to the

defendant's state of knowledge and intent.   The defendant has therefore failed to establish the

extraordinary circumstances necessary to warrant the granting of a new trial under Rule 33.

Furthermore, as described above, given the overwhelming evidence of the defendant's guilt

presented at trial, this is not a case where there is any concern that an innocent person may have

been convicted.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendant's motions in their

entirety.

Dated:   New York, New York
         July 31, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney for the
Southern District of New York

By: _____
    Dina McLeod / Sagar K. Ravi / Niketh Velamoor
    Assistant United States Attorneys
    (212) 637-1040 / 2195 / 1076

17